**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Criminal No. 22-cr-10355-NMG |
| PANKAJ MERCHIA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL

Dr. Pankaj Merchia, by and through undersigned counsel, respectfully submits this memorandum of law in support of his motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.

## APPLICABLE LEGAL STANDARD

A district court "may vacate any judgment and grant a new trial if the interests of justice so requires." Fed. R. Crim. P. 33(a). "[T]he ultimate test for granting a new trial pursuant to [Rule 33] is whether letting a guilty verdict stand would be a manifest injustice." *U.S. v. Veloz*, 948 F.3d 418, 437 (1st Cir. 2020) (internal quotation marks omitted). A district court may grant a new trial if the trial evidence, though constitutionally sufficient, preponderates heavily against guilt. *See, e.g.*, *U.S. v. Simon*, 12 F.4th 1, 56 (1st Cir. 2023).

## ARGUMENT

The government's trial narrative was predicated on mischaracterizations of the insurance submissions at issue. The government did not merely argue competing inferences; it presented a materially incorrect interpretation of the CMS 1500 forms. But because Dr. Merchia was *pro se* and lacked the skill to clearly demonstrate why and how the government's interpretation made no sense, the jury was not properly equipped to independently evaluate the government's theory of

1

guilt.[1]  The jury thus rendered a verdict that likely was based on profound, prejudicial confusion about what the evidence actually showed.  Because of the spillover effect that the healthcare and money laundering charges clearly would have had on the tax fraud charges, this jury confusion prejudiced Dr. Merchia on every charge against him.  In the interests of justice, Dr. Merchia should be granted a new trial at which he can be represented by counsel.

**I.     The Government's Mischaracterization of the Insurance Submissions Unfairly Prejudiced Dr. Merchia and Undermined the Reliability of the Jury's Verdict.**

The government's trial narrative was that Dr. Merchia directed the submission of millions of dollars worth of fraudulent insurance claims for patients he had not treated in years.  The government elicited from its very first witness, Brian Robinson, that it was "accurate" that "CPAP Concierge billed [an insurance company] for [Dr. Merchia's brother] for more than 1.8 million dollars."  Tr. of Jan. 12, 2026 (Afternoon Session), p. 62:8-11.  Similarly, the government elicited from Kevin Richard, an investigator with the Massachusetts Insurance Fraud Bureau, that CPAP Concierge billed an insurance company over $3 million for patient P.C., who Dr. Merchia treated years before the insurance claims were submitted.  *See* Tr. of Jan. 20, 2026 (Morning Session), p. 64:20-22 ("Q: And how much was billed for [patient P.C.]? A: . . . Billed for [the patient] was $3,221,166.59."); Tr. of Jan. 15, 2026 (Morning Session), p. 13:15-25 (patient P.C. testifying that he told Dr. Merchia in 2010 that the CPAP machine was "not helping that much," and that he "can't imagine" that the device was "medically necessary" after that time).  The government elicited from Mr. Robinson that CPAP Concierge and CPAP Clinical Services submitted a total of

---

[1] Dr. Merchia's *pro se* status impaired the truth-seeking function of trial in innumerable ways.  He was not skilled or experienced enough to ask the right questions, to present evidence (including his own direct testimony) within the time limits the Court imposed on him, to locate and retain experts who could have bolstered his defense themes, or to explain the relevance of defense witnesses that the Court precluded. And even more generally, the mere fact that Dr. Merchia was *pro se* probably caused the jury to doubt his credibility, which essentially is a death knell for a white collar defendant charged with fraud.

$169,889,897.39 in insurance claims, a preposterously huge figure. *See* Tr. of Jan 20, 2026 (Morning Session), p. 63:7-8 ("Q: What was billed in total? A: Total billed was $169,889,897.39."). The government argued that Dr. Merchia had directed all of these insurance submissions. *See* Tr. of Jan. 27, 2026 (Morning Session), pp. 12:25 – 13:2 ("You'll look at all this evidence and follow the evidence. It leads back to one person, ladies and gentlemen, this man, the defendant, Dr. Pankaj Merchia.").

Regardless of a patient's medical condition, billing an insurance company millions of dollars—or even hundreds of thousands of dollars—for a single patient's CPAP or BiPAP machine is admittedly shocking. Not surprisingly, the government made this the centerpiece of its case. In closing, the government argued: "[H]e increased the billing 50-fold [from] the previous billing. This shows, ladies and gentleman, an eye to the defendant's intent. He knew he couldn't do what he wanted to do so he bulk billed again and again, 50 times more [than he should have] in order to get this money." Tr. of Jan. 27, 2026 (Morning Session), pp. 17:23 – 18:2. The government also used CPAP Concierge's and CPAP Clinical Services's submission of the CMS 1500 forms as the foundation for its overarching narrative that Dr. Merchia was motivated by "[a]rrogance and greed," believed "the rules were not things to follow" but rather "obstacles to outsmart and outmaneuver," and "thought he could be held unaccountable." Tr. of Jan. 27, 2026 (Morning Session), p. 10:8-17. This narrative was a devastating blow to Dr. Merchia's honesty and credibility, both as a defendant and as a *pro se* advocate. The government's characterizations of the insurance submissions at issue therefore helped the government obtain guilty verdicts not only on the healthcare fraud and money laundering charges, but the tax charges as well.

The government's characterization of CPAP Concierge's and CPAP Clinical Services' CMS 1500 claim forms, however, was not a fair one. The only fair interpretation of the CMS 1500

claim forms at issue is that they were intended to remind and pester the insurance companies about the long-overdue unpaid balances for medical devices patients legitimately had received years earlier. Contrary to the government's portrayal, the companies were not asking insurance companies to pay millions of dollars for a single patient's CPAP or BiPAP machine. CPAP Clinical Services and CPAP Concierge were merely requesting to be paid the modest lease balances (*e.g.*, $20,000) that the insurance companies, ostensibly without any justification, had completely failed to pay. *See, e.g.*, Tr. of Jan. 14, 2026, p. 136:20-24 (government stipulation that the insurance company did not pay any of the patient's claims until 2017); Tr. of Jan. 15, 2026 (Morning Session), p. 41:4-5 (government stipulation that the insurance paid only one of the 45 claims submitted for patient P.C.).

Because the insurance companies continued to ignore CPAP Concierge's and CPAP Clinical Services' payment requests, the companies reasonably decided that they should continue to send the requests on a monthly basis—just as a credit card company would send routine monthly correspondence reminding a delinquent customer about an unpaid balance. Although CPAP Concierge and CPAP Clinical Services used CMS 1500 claim forms to convey these payment requests—which may have been administratively incorrect—CPAP Concierge and CPAP Clinical Services conspicuously included on the claim forms the words "Amt is lease balance. see www.StandardMedicalBilling.com," or "NOC Amt=purchas[e] price balance see StandardMedicalBilling.com[.]" *See* Exh. 300; Exh. 349. And the "charges" listed on the claim forms were for amounts (*e.g.*, $20,000) that the insurance companies could not reasonably have construed as a single month's lease charge. *See id.* In addition, the amount listed in Box 30 of the CMS 1500 claims forms (entitled "Balance Due") remained static across the CMS 1500 claims forms submitted for each patient. *See, e.g., id.*, pp. 1, 4, 7, 15, 16, 21 (six monthly claim forms for

patient S.A., showing a static "Balance Due" of $20,000).  If the government's theory about the CMS 1500 claim forms were right, the "Balance Due" amount should have been increasing with each new monthly submission (*e.g.*, going from $20,000 to $40,000 to $60,000, etc.).  It did not; instead, the figure stayed the same every month.  This further demonstrates that the evidence cannot rationally support a finding that Dr. Merchia, even *assuming* he was responsible for all of the CMS 1500 forms that were submitted, acted with a fraudulent intent to bilk insurance companies out of millions of dollars.

Insofar as any insurance company overpaid CPAP Concierge or CPAP Clinical Services, the evidence showed that this was because the insurance company's automated data systems failed to recognize the portion of the CMS 1500 claim forms that clearly stated that the only payment being sought was the unpaid balance on the device rental.  *See* Tr. of Jan. 13, 2026 (Morning Session), pp. 81:17 – 82:8; *see also* Tr. of Jan. 13, 2026 (Afternoon Session), p. 52:10-21 (insurance company admitting that payments of ~$495,000 for machine rentals may have been for 867 patients, or an average of ~$575 per patient).  Dr. Merchia could not have anticipated this system failure on the insurance company's part.  Similarly, another insurance company admitted that its payments of ~$100,000 for a single patient may have gone directly to *the patient*, rather than to CPAP Concierge or CPAP Clinical Services.  *See* Tr. of Jan. 13, 2026 (Afternoon Session), p. 50:10-23.  Thus, the evidence did not show that Dr. Merchia somehow would have been on notice that the insurance companies were being deceived by the CMS 1500 claim forms, following which Dr. Merchia proceeded to have CPAP Concierge and CPAP Clinical Services continue to send more and more CMS 1500 claim forms anyway.

The manner in which the government presented the insurance submissions, however, gave the jury the misimpression that Dr. Merchia's intent was to get millions of dollars from the

insurance companies by directing CPAP Concierge or CPAP Clinical Services to bill an additional $20,000 (and sometimes more) every month—month after month after month after month—for a single patient's CPAP or BiPAP machine, even years after Dr. Merchia had last seen the patient. *See, e.g.*, Tr. of Jan. 27, 2026 (Morning Session), at p. 63:19-21 (government arguing that Dr. Merchia "spam[med]" the insurance companies with "bulk claims"). The government repeatedly injected this theory into the courtroom through its witnesses and expressly argued this theory in its closing. Given the complexity of the subject matter, Dr. Merchia's inability to call a healthcare billing expert to support his defense, and the enormous credibility disparity between the parties (*i.e.*, skilled AUSAs bearing the mantle of the United States versus a *pro se* defendant that the government painted as a crackpot fraudster), the jury was naturally going to blindly defer to the government's version of the story.

It would have been fair to criticize Dr. Merchia's decision to use CMS 1500 claim forms, rather than collection letters on company letterhead, to remind and pester the insurance companies about the long-overdue CPAP and BiPAP rental balances that they had not paid. But using the wrong type of correspondence to communicate with the insurance companies about long overdue bills is not a federal healthcare fraud; at most, it is an administrative infraction. That is why the government characterized Dr. Merchia's conduct not merely as administratively incorrect, but as an intentional scheme to get the insurance companies to pay outrageously inflated claims based on false representations. *See* Tr. of Jan. 27, 2026 (Morning Session), p. 13:9-11 ("[T]he company . . . actually billed Harvard Pilgrim for the $1.8 million . . . ."); *id.*, p. 18:23 ("[H]e increased the billing 50-fold[.]").

Dr. Merchia attempted to explain to the jury that (1) the CMS 1500 claim forms the government introduced into evidence were simply seeking to remind the insurance companies of

long-overdue unpaid balances for fully reimbursable invoices that had been submitted years earlier, and (2) those submissions were not intended to bill the insurance companies $20,000 per month—month after month after month—for a device rented to a patient. *See* Tr. of Jan. 20, 2026 (Morning Session), pp. 85-87. But Dr. Merchia was a *pro se* defendant who lacked the skill and credibility to correct the inflammatory misimpressions with which the government's evidentiary presentation and arguments certainly left the jury. Dr. Merchia's *pro se* status also contributed to his inability to proffer an expert witness who could explain to the jury why the insurance submissions at issue—including the submissions relating to Dr. Merchia's brother—were reasonable. *See* ECF No. 492 (denial of Dr. Merchia's request for a brief trial continuance so that he could retain a billing expert). The government exploited Dr. Merchia's skill, credibility, and expert witness deficits in its closing argument, which it could not have done had Dr. Merchia been represented at trial by able counsel. *See* Tr. of Jan. 27, 2026 (Morning Session), p. 63:7-10 ("Dr. Merchia's arguing to you that this wasn't some type of fraud because he was simply billing for the [overdue] balance . . . . If you look at the actual claims in this case, you know that's not true."). The adversary process itself was thus insufficient to correct the severely prejudicial jury confusion that predictably resulted from the government's evidentiary presentation and arguments.

Stripped of the misleading gloss that the government gave to the CMS 1500 claim forms at issue, the government's case against Dr. Merchia was weak. First, whether CPAP Concierge and/or CPAP Clinical Services were entitled to bill for the CPAP machine that was provided to Dr. Merchia's brother was, at the very least, debatable. Moreover, the government's evidence that Dr. Merchia actually knew that the family-member exclusion applied to *non-contracted* providers was entirely circumstantial. Thus, at a fair trial, Dr. Merchia's good faith defense would have had a substantial likelihood of persuading the jury to find reasonable doubt. Second, with respect to

both his brother and his other patients, the government did not present any evidence that Dr. Merchia ever prescribed or billed for a CPAP or BiPAP machine that was medically unnecessary. Thus, with respect to the patients other than Dr. Merchia's brother, the government's theory of falsity (and thus of fraud) depended entirely on the aforementioned inaccurate characterization of the CPAP Concierge and CPAP Clinical Services insurance submissions. *See, e.g.*, Tr. of Jan. 27, 2026 (Morning Session), p. 21:3-4 ("[Dr. Merchia] knew that he couldn't put a date of service with a billing period that was eight years before. There was no way the insurance company was going to grant that application."). Third, with respect to the tax counts, the government's case that Dr. Shona Pendse had not purchased Sleepheart of Virginia in an arm's length transaction both was entirely circumstantial and rested on a strained "tax arbitrage" theory—specifically, that Dr. Merchia chose to pay $2.2 million in capital gains taxes on a supposedly fake sale in order to avoid *future* income taxes on *future* business income that the fledgling Sleepheart of Virginia might not even generate. By unfairly painting Dr. Merchia as a massive healthcare fraudster, the government created a prejudicial spillover effect that helped it obtain a guilty verdict on specious tax fraud charges that were subject to a heightened willfulness requirement. *See* Tr. of Jan. 27, 2026 (Morning Session), p. 92:10-19.

In the interests of justice, the Court should grant Dr. Merchia a new trial at which (1) the government is precluded from unfairly characterizing the CPAP Concierge and CPAP Clinical Services insurance submissions, and/or (2) Dr. Merchia is represented by legal counsel with the acumen to rebut whatever unfair characterizations of the evidence the government makes to the jury.

**II.    Dr. Merchia Should Have Been Permitted to Call Fact Witnesses Who Possessed Relevant Exculpatory Evidence on the Tax Fraud Charges.**

The Court precluded Dr. Merchia from calling Dr. Samuel Wu (among others) to offer critical exculpatory testimony to rebut the government's tax allegations regarding the sale of Sleepheart of Virginia.  We respectfully submit that this was error.

The government's tax theory was two-fold: (1) that the sale had not actually occurred; and (2) that even if the sale had occurred, it was not arm's length, lacked economic substance, and was solely for the purpose of generating future amortization deductions.  *See, e.g.*, Tr. of Jan. 16, 2026 (Morning Session), pp. 118:8 – 119:2; Tr. of Jan. 16, 2026 (Afternoon Session), pp. 50:25 – 51:6. Demonstrating the severity of the dysfunction in Dr. Merchia's relationship with Dr. Shona Pendse was critical to rebutting each of these two theories.  So too was demonstrating that $30 million was a fair valuation of Sleepheart of Virginia in 2008.  The more dysfunctional Dr. Merchia's relationship with Dr. Pendse was, the less likely it was that they had conspired to concoct a fake sale and the more likely it was that the transaction was arm's length under the IRS's multifactor test.  And if $30 million was a fair valuation for Sleepheart of Virginia at the time of the transaction, the more likely it was that the transaction actually was a real one rather than concocted to provide an illegitimate tax write-off for the "buyer."

The dysfunctional nature of Dr. Merchia's relationship with Dr. Pendse and the fair valuation of Sleepheart in 2008 were the exact topics about which Dr. Wu would have testified. *See* Tr. of Jan. 21, 2026 (Morning Session), p. 5:20 – 6:8.  Dr. Gordon Harper also was primed to testify on this topic.  *See id.*, p. 11:16-23.  Both were in the courtroom ready to testify.  Yet, the Court precluded Dr. Wu and Dr. Harper from testifying entirely.  Tr. of Jan. 22, 2026 (Morning Session), p. 12:12 (precluding Wu); Tr. of Jan. 21, 2026 (Morning Session), p. 11:16 – 12:19 (precluding Harper)  This was devastating to Dr. Merchia's ability to defend himself.

9

To be sure, Dr. Merchia introduced testimony about his relationship with Dr. Pendse and about why $30 million was a fair valuation at the time of the transaction. But this testimony essentially came from Dr. Merchia's family members, as well as through Dr. Merchia's own testimony. The jury naturally would have viewed Dr. Merchia's family members and Dr. Merchia as biased witnesses. Dr. Wu and Dr. Harper were objective witnesses whose corroborating testimony would have been far more difficult for the government to impeach or for the jury to discount or disregard. Thus, just as Dr. Merchia represented to the Court, Dr. Wu's and Dr. Harper's testimony was of critical importance to Dr. Merchia's defense. *Cf., e.g.*, *Outley v. New York*, 837 F.2d 587, 590-591 (2d Cir. 1988) (finding that excluded witnesses' testimony would have "provide[d] independent evidence in what was otherwise essentially a test of [the plaintiff's] word against the officers" and therefore would have "bolster[ed] [the plaintiff's] credibility," which is why "the evidence [from] these witnesses was so important").

Dr. Merchia's ability to receive a fair trial *on all counts* was substantially impaired by his inability to call Dr. Wu and Dr. Harper. Where a defendant is accused of being a tax cheat, that accusation—if not rebutted with strong evidence—certainly will have substantial spillover effect on other fraud-related charges brought against the defendant. The Court's preclusion of Dr. Wu and Dr. Harper warrants a new trial in the interests of justice.

## III.    The Evidence Preponderates Heavily Against Guilt, and It Would Be a Miscarriage of Justice to Allow the Jury's Guilty Verdicts to Stand.

The evidence preponderates heavily against guilt here. The government may have proven that Dr. Merchia is administratively inept, but that does not establish a fraud, let alone fraud on the scale that the government insinuated at trial. If Dr. Merchia would have had the assistance of effective counsel, there is a strong likelihood that the jury would not have found Dr. Merchia

guilty. We respectfully request that the Court grant Dr. Merchia a new trial at which he is represented by counsel.

## CONCLUSION

Collectively and individually, the issues above warrant a new trial for Dr. Merchia in the interests of justice.

Respectfully Submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz
Aaron Katz Law LLC
399 Boylston St., 6th Floor
Boston, Ma 02116
617-686-0677
Akatz@Aaronkatzlaw.com

Dated: April 13, 2026

11

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 13, 2026, I electronically filed the forgoing document with the clerk of court by using the CM/ECF system which will send the notice of electronic filing to all attorneys of record.

*/s/ Aaron M. Katz*
Aaron M. Katz